QQL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**GERI KANNAPIEN, JANICE ROHZON** )
                     )
           Plaintiffs, )
                     )
    v. )
                     )   No.  04 C 6829
**QUAKER OATS COMPANY, a unit of** )
**PepsiCo, and PEPSICO,** )
                     )
           Defendants. )
                     )

## MEMORANDUM OPINION AND ORDER

This case arises out of the payment of voluntary retirement
benefits to two employees of the Quaker Oats Company ("Quaker") at
its Bridgeview, Illinois plant. Geri Kannapien ("Kannapien") began
her employment with the Golden Grain Company ("Golden Grain") in
1977. Janice Rozhon ("Rozhon") began her employment at Golden
Grain in 1980. Golden Grain produces a variety of consumer
products, the most notable of which was Rice-a-Roni, "the San
Francisco Treat." The Quaker Oats Company ("Quaker") acquired
Golden Grain in 1986. In 1990, Kannapien and Rohzon (collectively
"plaintiffs") became participants in the Quaker Retirement Plan
(the "retirement plan"). Prior to the acquisition, plaintiffs had
participated in the Golden Grain Profit Sharing Plan. After the
acquisition, that account rolled over into an account at Quaker
separate from the retirement plan.

In 2001, PepsiCo, Inc. ("PepsiCo") acquired Quaker. According to the Quaker Retirement Plan, employees terminated non-voluntarily within two years of a change in control were entitled to certain change-in-control benefits ("CIC benefits") in addition to their standard pension payments under the plan. Specifically, these benefits included the payment of a temporary and a permanent supplement to the terminated employee. These CIC benefits were available to plaintiffs as a result of PepsiCo's acquisition of Quaker. In April 2003, shortly before the two year period elapsed, plaintiffs terminated their employment with Quaker. At the time of their retirement, Kannapien was employed as an Administrative Secretary and Rohzon was employed as an Human Resources Assistant.

The circumstances surrounding plaintiffs' termination are as follows: In March 2003, at a meeting of Quaker employees at the Bridgeview plant, the Bridgeview Plant Manager, Tom Winters, told the employees that, in order to cut costs, the company was offering special retirement benefits to those interested in terminating their employment. The employees were instructed to contact Human Resources Manager Jeff Satterlee ("Satterlee") if they were interested. Plaintiffs each contacted Satterlee individually for more details regarding the early retirement benefits. Plaintiffs each met with Satterlee individually on multiple occasions at which time they were given more details about the benefits.

According to plaintiffs, at these meetings, Satterlee orally informed plaintiffs that if they terminated their employment prior to the two year change-in-control deadline, they would receive a combination of severance benefits, pension benefits, and temporary and permanent supplements all calculated based upon their total years of service dating back to their original hire date at Golden Grain. In describing the benefits to plaintiffs, Satterlee relied on the language contained in a document prepared for each plaintiff by the Quaker Employee Administration Center ("QEAC") dated March 14, 2003 (the "March 14 documents") describing the benefits each individual plaintiff would receive upon termination. The document provided details on the retirement, severance, vacation, medical and dental, life insurance, disability, and other benefits plaintiffs would receive. The part of the document describing retirement benefits made no representation about the standard pension payment, but stated that temporary and permanent supplements would be calculated using a formula based upon their "total service" or "years of service." The document specifically stated:

IX. Retirement Income Plan

> If you were a participant in the Retirement Plan upon Change in Control (May 1, 2001), you are 100% vested in the plan, regardless of years of service. The Quaker Retirement Plan also provides for additional pension benefits for salaried persons who are terminated from active employment on or before May 1, 2003.

3

The additional benefits consist of one or more
of the following:

> A permanent supplement payable as
> early as age 55 of .25% multiplied
> by your Last Full Year of eligible
> earnings multiplied by your total
> service at the end of your inactive
> service period.

> Employees who are at least 50 but
> not yet age 55 at the end of their
> active service and have 10 Years of
> Service will be eligible for a
> temporary supplement payable upon
> retirement (as early as age 55) to
> age 62 of $240 multiplied by their
> Years of Service through their
> inactive period.

> Employees who are at least 55 but
> not yet age 62 at the end of their
> active service and have 10 Years of
> Service will be eligible for a
> temporary supplement payable upon
> retirement (as early as age 55) to
> age 62 of $360 multiplied by their
> Years of Service through their
> inactive period.[1]

"Years of Service" is not defined in that document. According
to the language of the official retirement plan document, however,
the pension and supplement payment were to be calculated according
to plaintiffs' credited years of service. For plaintiffs, their
credited years of service differed from their total years of
service because they did not start receiving credited service until

---

[1]The record suggests that the erroneous language found in this
document derived from a 2002 memorandum distributed by Quaker's
Director of Benefits and Payroll Administration, Brian Tischendorf.
The record does not indicate who authored that memorandum, however.

4

their enrollment in Quaker's retirement plan in 1990. Additionally, although plaintiffs volunteered to be terminated, Quaker allowed their terminations to be characterized as involuntary so that they would be eligible to receive the temporary and permanent supplements which, under the terms of the retirement plan, were only available to involuntarily terminated employees.

Plaintiffs accepted the early retirement benefits and their last day of active employment at Quaker was April 26, 2003.[2] After leaving active employment, plaintiffs received approximately thirteen months of severance payments. The severance payments were calculated using their original start date with Golden Grain in accordance with the terms of the severance plan based upon their total years of service. In May 2004, plaintiffs received documentation in the mail regarding their pension and supplement payments. The documentation showed that these payments would be calculated according to the terms of the retirement plan using plaintiffs' credited years of service and not their total years of service. Plaintiffs contacted Quaker and then appealed the calculation of these benefits to the PepsiCo Administration Committee. Pepsi denied their appeals stating that their benefits

---

[2] In addition to the aforementioned statements, plaintiffs also point to additional oral and written statements that they claim led them to believe that their pension and supplement payments would be calculated based upon their original hire date at Golden Grain. These statements will be discussed, *supra*.

5

were appropriately calculated with credited service dating back only to 1990.

The fourth version of plaintiffs' complaint (the third amended complaint) alleges five claims against defendants: 1) an ERISA estoppel claim to prevent Quaker from enforcing the terms of the plan; 2) an ERISA claim for breach of fiduciary responsibility; 3) a claim for violation of the "Anti-Cutback Rule" (already denied by this Court); 4) a claim for equitable estoppel; and 5) a state law breach of contract / promissory estoppel claim. Plaintiffs concede that their severance payments were correctly calculated and seek only increased pension and supplement payments. Defendants filed a motion for summary judgment. Plaintiffs, in turn, responded with their own motion for summary judgment.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. _Lexington Ins. Co. v. Rugg & Knopp, Inc._, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56©. I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The non-moving party cannot rely upon unsupported assertions or speculation in order to meet its burden.

## I. Estoppel Claims[3]

Plaintiffs admit that under the terms of the retirement plan they are not entitled to any more benefits than they have in fact received. Therefore, plaintiffs seek to enforce the representations made to them regarding the terms of the retirement plan through principles of estoppel. The Seventh Circuit has held that estoppel is available in an ERISA action only in limited circumstances. In order to establish an estoppel claim, plaintiffs must show 1) a knowing misrepresentation by defendants; 2) in writing; 3) with reasonable reliance by the plaintiff on the misrepresentation; and 4) that plaintiffs' reliance was to their detriment. *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000). A negligent misrepresentation is not sufficient to establish an ERISA estoppel claim. *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005) ("[A]rguments that negligent misrepresentations 'estop' sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful.") (quoting *Decatur*

---

[3] Although there is some confusion and redundancy in the complaint, plaintiffs, having conceded that they are not entitled to additional benefits under the terms of the plan, are not bringing an ERISA 29 U.S.C. § 1132(a)(1)(B) action. That subsection does not provide a remedy in this case. Any such claim would necessarily fail because the decision of PepsiCo's administrative committee to enforce the terms of the plan was not arbitrary and capricious. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004). Instead, plaintiffs bring an estoppel claim which is properly characterized as an § 1132(a)(3) action (counts I and IV). *See Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 586 n.7 (7th Cir. 2000).

7

*Mem'l Hosp. v. Connecticut Gen. Life Ins. Co.*, 990 F.2d 925, 926-27 (7th Cir. 1993)). Incorrect oral statements cannot amend an ERISA pension plan or serve as the basis of an estoppel claim against an ERISA pension plan. *See Downs*, 214 F.3d at 805-06 ("[Plaintiff] cannot rely on the oral statements by [defendants] because the estoppel doctrine does not override the aforementioned rule proscribing oral modification of an ERISA plan."); *Frahm v. Equitable Life Ins. Soc'y of the United States*, 137 F.3d 955, 961 (7th Cir. 1998).

Plaintiffs attempt to establish their estoppel claims arguing that the following misrepresentations induced them to retire: 1) the oral representations made by Satterlee in their individual meetings stating that their pension and supplement payments would be calculated according to their total years of service; 2) the oral representations made by Satterlee and Tom Winters encouraging them to accept early retirement because it was a very good deal; 3) written statements from the Quaker Benefits Handbook; 4) a document entitled "Understanding Your Severance Benefits;" 5) a document from December, 20002 entitled "Personalized Information for [plaintiff]" sent to both plaintiffs that summarized their pension benefits; and 6) the March 14 documents provided by Satterlee to plaintiffs in their individual meetings with him.

These representations, viewed individually or as a whole, do not establish an actionable estoppel claim against a pension plan

8

under the law of this Circuit as articulated in *Downs* and *Helfrich v. Carle Clinic Assn., P.C.*, 328 F.3d 915, 918 (7th Cir. 2003). Oral statements cannot serve as the basis of an estoppel claim for an ERISA pension plan. *See Downs*, 214 F.3d at 805-06. Only another plan document (such as a summary plan document or SPD) may estop a plan from enforcing the language in the official plan document. As the *Helfrich* court explained:

> The doctrine that the summary plan description prevails over the plan is a form of estoppel; to establish the limits of this doctrine is to establish the limits of estoppel. No matter what label applies, documents prepared by an employer do not supersede those documents that establish the terms of a pension plan. Whether, and to what extent, estoppel is available with respect to welfare benefit plans under ERISA is an issue on which the judiciary has not come to rest, compare *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 961 (7th Cir. 1998), with *Shields v. Teamsters Pension Plan*, 188 F.3d 895 (7th Cir. 1999), but with respect to pension plans (which by statute must be very formal) the only variance that any court has allowed depends on the plan's own writings, such as summary plan descriptions.

*Helfrich*, 328 F.3d at 918. Additionally, the facts of this case are analogous to those of *Downs*. In *Downs*, the court held that written and oral representations made by an employer to an employee that he would receive greater credited service than he was entitled to under the actual terms of the company's plan could not estop the plan from enforcing the plan according to its terms.[4] I disagree

---

[4] *Downs* also failed to establish any detrimental reliance on the claimed misrepresentations. Plaintiffs attempt to establish detriment and damages in this case by arguing "[d]efendants failure to follow through on their promises, which induced Plaintiffs to act, was to Plaintiff's obvious detriment." Plaintiffs' argument

with plaintiffs that the fact that Quaker first proposed the idea of retirement to plaintiffs distinguishes this case. While this fact may be relevant to plaintiffs' attempts to establish reliance, it does not alter the framework of analysis.

First, plaintiffs cannot establish a claim for estoppel based upon the oral representations made to them by Satterlee and other Quaker employees because an estoppel claim cannot be based upon oral statements.[5] *See Downs*, 214 F.3d at 805-06. The undisputed record also establishes that these were only negligent misrepresentations. *Brosted*, 421 at 465. Moreover (with respect to the pension payments in particular), it is clear that Satterlee

---

is that the detriment / damage they suffered is the difference between the promised payments and the payments that they actually received. Obviously, plaintiffs are worse off than they would be if Quaker had paid them the additional benefits. These arguments, however, demonstrate a misunderstanding of the cause of action they have pled and the equitable remedies available to them. The appropriate inquiry is whether plaintiffs are worse off having retired than they would be had they remained in active employment. *See Frahm*, 137 F.3d at 961-62. Thus, in order to establish detrimental reliance, plaintiffs would need to show that 1) they actually would not have retired had they been correctly informed of the of the pension and supplement payment amounts 2) their decision to retire, which provided them with severance and supplement benefits that they otherwise could not have qualified for, and left them with the opportunity to engage in active employment elsewhere, put them in a financially worse position than they would have been had they remained in active employment.

[5] In addition, some of these statements do not even constitute misrepresentations. For example, Tom Winters statement "I think you owe it to yourself to make an appointment and look at the numbers because you're going to be very pleased" is not a misrepresentation about plaintiffs' credited service date or any other term of the plan. It simply does not contain a false statement of fact. *See Frahm*, 137 F.3d at 961.

10

was attempting to explain the terms of the plan as he understood them, although he did so incorrectly. At no point did Satterlee represent that the terms of the retirement plan were being altered because plaintiffs were accepting an offer of early retirement. Therefore, it is unreasonable for plaintiffs to either rely on Satterlee's words to inform them of the terms of the plan, or for plaintiffs to argue that his words could override the written terms of the plan explaining eligibility to give them credit for service for a period of time that they were not enrolled in the plan.

Second, plaintiffs' estoppel claim as it is based upon written misrepresentations also fails. In their brief, plaintiffs argue reliance on parts of the Quaker Benefits Handbook, which states that it serves as a summary plan document (an "SPD"). If an SPD is in direct conflict with the plan description, then the SPD would govern. *See Helfrich*, 328 F.3d at 918; *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1023 (7th Cir. 1998) ("[A] participant or beneficiary [may] rely on an SPD and estop a plan administrator from denying coverage for terms found in the underlying policy only if there is a direct conflict between an SPD and the underlying policy."); *Senkier v. Hartford Life & Accident Ins. Co*, 948 F.2d 1050, 1051 (7th Cir. 1991) ("There is not [a contradiction] in a case . . . where the policy clarifies rather than contradicts the summary."). The SPD will provide a basis for estoppel, however, only if the participant

11

relied on its language. *See Helfrich,* 328 F.3d at 918 ("So the rule that summary plan descriptions, *if relied on,* trump the plan itself does not assist plaintiffs. . . .") (emphasis added).

A review of the portions of the SPD cited by plaintiffs and the record in this case indicate that estoppel based upon the SPD does not apply in this case. First, plaintiffs have brought forth no evidence (and I have found none in the record) that demonstrates that plaintiffs actually relied on the language of the SPD. I have read both plaintiffs' depositions and neither mentions the SPD as a basis for their decision.[6]

Second, even if plaintiffs could demonstrate reliance, the language cited by plaintiffs from the SPD (*see* Plaintiffs' statement of facts at ¶¶ 71-74) does not directly conflict with the plan language in the official plan document. The language found in the official plan document (Exhibit A to defendants' first motion for summary judgment) is not ambiguous or misleading with regard to the calculation of credited service.[7] Some of the language

---

[6] In Kannapien's case, she even explicitly states that she relied exclusively on the information provided to her by Satterlee in making her decision. ("Jeff told me what I was getting, and I made that decision based on what he told me."). In Rohzon's case there is simply no evidence from which a fact-finder could conclude that she relied on the language in the SPD.

[7] The plan states that the calculation of pension benefits uses the years of credited service a participant has accrued. The plan further states that a participant may only accrue credited service for the years they are considered eligible employees under the terms of plan. According to the plan, salaried Golden Grain employees did not become eligible until the plan was extended to

12

plaintiffs cite from the SPD as misleading does not even come from

the retirement plan's SPD, but instead comes from the severance

plan's SPD.[8]   The severance plan has a different definition of

credited service and its SPD cannot create a conflict with the

*retirement* plan's language. The other language cited by plaintiffs

is general language from the retirement plan's SPD describing the

calculation of credited service and does not address the issue of

when a participant becomes eligible to start accruing credited

service.[9]  *Mers*, 144 F.3d at 1024 ("If silence in the SPD were

enough to trump the underlying plan, then SPDs would mushroom in

size and complexity until they mirrored the plans."). Finally, the

SPD indicates it is not intended to cover every situation and

provides a disclaimer stating:  "[w]e have made every attempt to

summarize the documents and policies accurately and completely in

the handbook. However, if there is an error in the handbook, or if

them on July 1, 1990.

[8] Plaintiffs cite language from the *severance* plan stating "[u]nder this plan your credited service is your continuous calendar years of employment from your most recent date of hire with Quaker (or a company acquired by Quaker)."

[9] The cited language states "to calculate your annual pension, Quaker uses two different formulas and pays the higher amount.  The Credited Service Formula.  Using this formula, your benefit is based on the number of years of credited service you earned while working for Quaker.  The Earnings/Service Formula.  Using this formula, your pension benefit is stated as the sum of your individual yearly benefit."  Furthermore, it is logical that the description of the calculation presupposes that one is actually enrolled in the plan in order for it to apply.

13

a situation arises that is not described in the handbook, the official legal documents and policies will govern." *See Helfrich*, 328 F.3d at 916 ("[C]onflicts between this document and the plan itself are resolved in favor of the summary plan description (unless it alerts the reader to look for additional terms in the full plan)."); *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1048 (7th Cir. 2004) ("Larding the summary with minutiae would defeat that document's function: to provide a capsule guide in simple language for employees.") (quoting *Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 984 (7th Cir. 1992)).

Next, plaintiffs claim reliance on a document entitled "Understanding Your Severance Benefits." As defendants point out, this document applies to distributions made under Quaker's severance plan. The March 14 documents (upon which plaintiffs claim reliance) clearly state that pension and supplements are paid from the retirement plan. Accordingly, these documents describing the severance plan do not contain a misrepresentation and do not provide a basis to estop the unrelated Quaker retirement plan.

Plaintiffs also argue that they relied on a December 2002 summary of pension benefits statement entitled "Personalized Information" that they each received. The document provided a synopsis of plaintiffs' estimated pension benefits at the time. The statements incorrectly listed plaintiffs' credited service as going back to their original hire dates, but provided plaintiffs

14

with correct calculations of their estimated pension benefits.[10] The undisputed record establishes that the misstatement of plaintiffs' credited service date was a clerical error. It was not an intentional misrepresentation and cannot serve as the basis for an estoppel claim. *See Downs*, 214 F.3d at 806. Additionally, these statements have a disclaimer stating that "[t]his statement is not an official plan document and should not be considered a representation, contract or guarantee of any benefit or continued employment. In the event of a conflict between this statement and the official Plan documents, the official Plan documents will govern." Finally, the pension payment estimates contained in these documents are correct and plaintiffs do not suggest that they believed the estimate was calculated inaccurately or was an understatement of their benefits. Therefore, any claim by plaintiffs that they reasonably relied on the incorrect credited service date in estimating their pension benefits is undermined. Plaintiffs' remaining argument (below) applies only to the supplement payments. Therefore, at this juncture, I grant defendants' motion for summary judgement with respect to the pension payments.

Plaintiffs also claim reliance on misrepresentations in the March 14, 2003 documents provided by Satterlee. These documents

---

[10] The actual pension estimate displayed in the document was determined according to a calculation that utilized plaintiffs' correct July 1, 1990 credited service date.

incorrectly stated that the supplements will be calculated based upon "Years of Service" or "total years" instead of a credited service date going back only to 1990.[11]   "No matter what label applies, documents prepared by an employer do not supersede those documents that establish the terms of a pension plan." *Helfrich*, 328 F.3d at 918.   Thus, this document does not supersede the unambiguous language of the plan regarding the calculation of the supplements based upon credited service dating back to 1990.[12]   The undisputed record also establishes that this error was an unintentional clerical error and is therefore not actionable. *Brosted*, 421 at 465.[13]

In order to avoid this result, plaintiffs rely on *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574 (7th Cir. 2000).  In *Bowerman*,

---

[11] The document itself makes no assertion as to the calculation of the standard pension benefits.  Therefore, it is evaluated with regard to the payment of temporary and permanent supplements.

[12] Plaintiffs have not shown that this document was an official plan document.   The document came from QEAC, is signed by Satterlee, does not characterize itself as an official plan document, and provides a personalized description of benefits across numerous plans at Quaker.   Therefore, plaintiffs have set forth no basis (nor have I found any in the record) upon which I could conclude that this was a plan document of the nature that could amend or estop the underlying plan language rather than a Company document.

[13] At the meetings, Satterlee also made a series of written of ad-hoc estimations of the payments plaintiffs would receive using the in correct total years of service.  For the same reasons, these incorrect written estimations, whether considered as an integrated part of the document or as separate representations, also do not estop the plan.

16

the Seventh Circuit held that Wal-Mart's health plan was estopped from denying health benefits for a preexisting condition to a returning Wal-Mart employee because the plan's documents were ambiguous, and those documents, along with subsequent incorrect oral representations of various employees, misled the plaintiff into not electing COBRA coverage for the period. The election of COBRA coverage would have enabled Bowerman to receive coverage for the preexisting condition upon her return to Wal-Mart. The court considered the oral misrepresentations as part of the estoppel analysis because "the Plan, through its own actions, reinforced the confusion created by its own documents and consequently prevented plaintiff from paying the COBRA premium . . . ." *Id.* at 587. The court, however, was explicit in stating that this exception was only applicable in cases where the plan language was ambiguous or misleading. The court stated:

> We have made clear in our earlier cases that the oral representations of an ERISA plan may not be relied upon by a plan participant when the representation is contrary to the written terms of the plan and those terms are set forth clearly. Here, that rule is not applicable because the Wal-Mart Plan documents are not free from ambiguity; indeed, they leave the employee in Ms. Bowerman's situation guessing as to the appropriate course of action. . . . Allowing estoppel when the documents are clear, moreover, would be inconsistent with the purpose of ERISA.

*Id.* at 588 (citations omitted) (also citing *Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir. 1996), for the proposition that "written and oral misrepresentations could not

17

serve as a basis of estoppel when plan documents were clear");
*Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 638 (7th Cir. 2004) ("[W]e
have found an exception when plan documents are ambiguous or
misleading, in which case oral representations as to the meaning of
documents may be relevant."). Additionally, the court in *Bowerman*
found a valid estoppel claim even though there was no evidence of
an intent to deceive.

Accordingly, I must determine if the facts of this case fall
under the purview of *Bowerman*. I note, first, that this case
involves a funded pension plan. The Seventh Circuit has
consistently reserved ruling on the applicability of estoppel
principles developed in cases involving single employer unfunded
welfare benefit plans (e.g., the health plan in *Bowerman*) to funded
pension plans (e.g., the plan in this case). *See e.g. Downs*, 214
F.3d at 806; *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 280 (7th
Cir. 1994). The court has stated that, due to concerns for the
actuarial soundness of other types of plans, estoppel may not be
appropriate. *See e.g Coker v. Trans World Airlines, Inc.*, 165 F.3d
579, 585 (7th Cir. 1999).

Assuming that estoppel principles may be considered in a
funded plan situation, the facts are fundamentally distinct from
*Bowerman*. In *Bowerman*, the court noted that "the 'basic policy
consideration arguing in favor of applying estoppel is the
principle of contract law that a party who prevents the occurrence

18

of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract.'" *Id.* at 586 (quoting *Gallegos v. Mount Sinai Med. Ctr.*, 210 F.3d 803, 809 (7th Cir. 2000)); *See also Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 542 (7th Cir. 1996). In *Bowerman*, the ambiguous and misleading representations caused Bowerman to fail to make an election for benefits that she was otherwise entitled to receive. Had she been able to make an informed decision, she would have elected COBRA coverage. That is why the appropriate award in *Bowerman* was retroactive reinstatement of COBRA coverage. On the other hand, in this case, according to the unambiguous terms of the retirement plan, plaintiffs could never have qualified for pension or supplement payments based upon their total years of service. Thus, rather than removing a procedural hurdle preventing plaintiffs from receiving substantive benefits that they are entitled to under the terms of the retirement plan, the application of estoppel in this case would have the effect of amending the substantive terms of the retirement plan in a manner not authorized by the terms of the plan. *See Downs*, 214 F.3d at 805.

Additionally, unlike *Bowerman*, the language found in the official retirement plan document is not ambiguous or misleading with regard to the calculation of credited service. *See* n.9, *supra.* Plaintiffs do not argue otherwise or claim that they did not have access to this information. I have already determined that the SPD

19

was not in direct conflict with the underlying plan document and was not ambiguous or misleading in its description of the retirement plan's calculation of credited service.

Last, without citing any authority, plaintiffs argue that defendants should not be able to strictly enforce the terms of the retirement plan because "the Company's resort to a 'strict language' of the Plan' defense is utterly disingenuous in light of the fact that [the retirement plan] by its terms, [was] applicable only to involuntary terminations" and "it is clear that Defendants will manipulate the benefits system whenever it suits them to do so." This argument is unpersuasive. Quaker allowed plaintiffs' voluntary terminations to be characterized as involuntary so that plaintiffs could receive the temporary and permanent supplement payments that they otherwise were eligible for under the terms of the plan. There is no evidence in the record of a bad faith motive behind this decision and plaintiffs benefitted financially as a result. Moreover, even if Quaker's decision to pay plaintiffs the temporary and permanent supplements violated the terms of the retirement plan, that violation bears no relation to the cause of action in this case, which seeks to recover for an independent dispute over different plan terms.

For the above reasons, I grant defendant's motion for summary judgment on the remainder of plaintiffs' estoppel claim.

20

## II. Fiduciary Duty Claim

Plaintiffs' second claim is for breach of fiduciary duty. To state an ERISA claim for breach of fiduciary duty, plaintiffs must establish: 1) that defendants are the plan fiduciaries; 2) that defendants breached their fiduciary duties; and 3) that the breach caused harm to the plaintiff. *Brosted*, 421 F.3d at 365.

Defendants argue that this claim must fail because § 1132(a)(3) only authorizes equitable relief and plaintiffs are seeking legal relief in the form of monetary damages. *See Great West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002). I agree with defendants that the relief requested by plaintiffs, damages in the amount of the difference between what they were promised and what they received in pension and supplement payments, is properly characterized as legal damages. Plaintiffs' attempts to label these damages as something else does not change this fact. *Id.* This argument is not dispositive on this claim, however, because given the circumstances of this case, the court is capable of fashioning a different equitable remedy that would be permissible. *See* Section I n.5, *supra*.

Turning to the merits of plaintiffs' claim, the first step is to identify the fiduciaries for the retirement plan. "In assessing whether a person can be held liable for a breach of fiduciary duty, 'a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue.'" *Plumb v. Fluid Pump Serv.*,

21

124 F.3d 849, 854 (7th Cir. 1997) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992)). In determining whether an individual acts as a fiduciary with respect to a particular activity "we must concentrate on the degree of discretion entrusted to that person." *Tegtmeier*, 390 F.3d at 1047. An individual who is not designated as a fiduciary may become one if he assumes the authority of a fiduciary. *See Plumb*, 124 F.3d at 855.

Plaintiffs make the unsupported assertion that "[i]n explaining the Plan terms to employees, defendants and their authorized agents (including Human Resources manager, Jeff Satterlee) are fiduciaries . . . ."[14] Section 1.4 of the plan states "[t]he authority to control and manage the non-investment operations and administration of the Plan is vested in an Administrative Committee." The committee consists of four persons

---

[14] Plaintiffs have cited no law for the proposition that the defendants or Satterlee should be considered fiduciaries with regard to the specific activities in this case. While it is true that Quaker has named itself the plan administrator, this administrative authority is delegated to a four-person administrative committee. *See* discussion, *infra*. Plaintiffs make no attempt to undertake any legal analysis of defendants' liability given this set of circumstances by, for example, showing that others outside the committee were authorized to communicate as fiduciaries. The court has done this analysis, but notes that additional arguments may have been waived. "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. . . . We will not do his research for him." *Pelfresne v. Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (citations omitted).

22

and § 11.1 of the plan specifically states that the committee may "determine conclusively all administrative questions arising under the Plan, including the power to determine the eligibility of employees and the rights of Participants and other persons entitled to benefits under the Plan and their respective benefits, to remedy any ambiguities, inconsistencies or omissions of whatever kind and make factual determinations" and "to direct all payments of benefits under the Plan."

Plaintiffs have chosen not to bring this suit against the administrative committee or anyone it has identified as a member of the committee. Plaintiffs also have not established any link between the misrepresentations in this case and the administrative committee or its members for which defendants could be liable. For example, there is no evidence that a member of the committee "authorized, participated in, or had knowledge of" any misrepresentations. *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997). Additionally, the plan's written documents provided correct information and plaintiffs have not brought forth any evidence beyond speculation from which a reasonable fact-finder could conclude that a fiduciary "failed to exercise due care in hiring, retaining, or training the non-fiduciary agent for the tasks assigned [them]'." *Id.* at 548. Plaintiffs also have not shown that Satterlee, or any other individual implicated in this case, exercised any discretionary

authority over the plan such that they should be considered a plan fiduciary and defendants liable for their conduct. Instead, the record demonstrates that the actions of these individuals fell squarely within the ministerial functions described in 29 C.F.R. § 2509.75-8. Furthermore, even if plaintiffs could establish the existence of a fiduciary, a breach of fiduciary duty claim premised on misstatements requires an intent to deceive. *Vallone*, 375 F.3d at 642 ("while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable.") "[T]he employer must have set out to disadvantage or deceive its employees . . . in order for a breach of fiduciary duty to be made out." *Id*. In this case, plaintiffs concede that there is no evidence of an intent to deceive.

For the above reasons, I grant defendants' motion for summary judgment on plaintiffs' claim for breach of fiduciary duty.

## III. State Law Claims

In their third amended complaint, plaintiffs have added a state law claim to enforce a severance agreement arguing that ERISA does not actually govern the matter before the court.[15] ERISA

---

[15] Having based the jurisdiction of this court on the presence of an ERISA claim from the inception of case, plaintiffs' attempt to argue that state law, and not ERISA, governs their claims is perplexing. Such a finding would destroy the original jurisdiction of this court and require the court to dismiss this case for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1367. Contrary to plaintiffs' assertions, defendants' argument pointing out this

24

"shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). *Pohl v. Nat'l Ben. Consultants*, 956 F.2d 126, 127 (7th Cir. 1992). Plaintiffs are challenging the amount of payments made under the retirement plan. The March 14 documents (upon which plaintiffs claim reliance) clearly state that the pension and supplement payments will be made from Quaker's retirement plan. Plaintiffs have cited no authority which supports their argument that a challenge to these payments can be brought outside of ERISA. The fact that plaintiffs received payments from multiple plans (the retirement and severance plan) upon retirement does not change the fact that the contested payments derive from the retirement plan. This claim is preempted and I grant defendants' motion for summary judgment.

Defendants have also requested an award of attorneys' fees on this claim. In *Stark v. PPM* Am. Inc., the Seventh Circuit articulated that the test for application of the ERISA fee-shifting statute was to determine if "the losing party's position [was] substantially justified and taken in good faith, or was that party simply out to harass its opponent?" 354 F.3d 666, 673 (7th Cir. 2004) (quoting *Bowerman*, 226 F.3d at 593 (citation omitted)). While plaintiffs' claim is ill-conceived and loses on the merits,

---

jurisdictional issue is not "artful spin of the jurisdictional issues."

I do not find plaintiffs' choice to bring the claim was made in bad faith and with the intent to harass defendants. Defendants' request for attorneys' fees is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge

**MAY 15 2006**

Dated:    May ___, 2006